United States District Court
Southern District of Texas
**ENTERED**
October 04, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JEREMY HUGHES, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:20-CV-00905 |
| | § | |
| BELLE STATION, *et al*, | § | |
| | § | |
| Defendants. | § | |

## **MEMORANDUM & ORDER**

The Court held a hearing on Defendants Eleazar Agrait and Scott Cogburn's Motion to Dismiss (Doc. 95) and Defendant Harris County's Motion to Dismiss (Doc. 96) on September 10, 2021. At that hearing, the Court ruled from the bench. The Court provides this Memorandum and Order to further document its rulings and reasoning.

### I.    BACKGROUND

Plaintiff Jeremy Hughes, who is Black, makes troubling allegations against Defendants Belle Station LLC, Harris County, and several individuals. For the purposes of the Defendants' Motions to Dismiss, the Court accepts the below well-pleaded facts as true. *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010).

Hughes alleges that he went to Belle Station, a Houston bar, for drinks on the evening of January 14, 2018. (Doc. 91 at 3.) There, Hughes says that Defendant David Buehring denied him entry under Belle Station's dress code policy. (*Id.*) Hughes, who was wearing a sports jersey at the time, indicated to Buehring that other patrons inside the establishment were wearing similar

1

jerseys. (*Id.*) Hughes's Complaint states that Buehring then permitted him to enter Belle Station, but "[a]t some point, and without [giving] an exact reason," ordered him to leave the bar. (*Id.*)

After Hughes complied with Buehring's order and departed Belle Station, he realized that he had "left his bar tab open and business debit card at the bar." (*Id.*) Consequently, Hughes returned and encountered Buehring and Defendants Agrait and Cogburn ("the Deputies") at the front door. (*Id.*) Defendants Agrait and Cogburn were Harris County Sheriff Deputies who also worked as security guards for Belle Station. (*Id.*) Hughes asserts that he was not permitted back into the bar and that the staff undertook "lackluster" efforts to locate his card. (*Id.*) Buehring then told Hughes that "he needed to leave immediately." (*Id.*) Hughes responded that it was important for him to get his card, but he was still not permitted to enter the bar. (*Id.* at 3–4.) Hughes then went to his car and called 9-1-1. (*Id.* at 4.)

After Hughes called 9-1-1, Buehring and the Deputies approached him in his car. (*Id.*) Hughes's Complaint states that Buehring "then contributed to or caused damage [to] Mr. Hughes's vehicle." (*Id.*) Hughes asserts that he responded by "back[ing] up his vehicle and [driving] to a safe location a few blocks away from Belle Station." (*Id.*) While Hughes waited for law enforcement to arrive, Houston Police Officer Kyle Mclaughlin responded to the scene. (*Id.*) Buehring told Officer Mclaughlin that Hughes had "committed a criminal act" by striking Buehring with his car. (*Id.* at 4.) Hughes then placed a second call to 9-1-1. (*Id.* at 5–6.) The dispatcher told him to wait outside of the bar. (*Id.*) As a result, Hughes drove back "to Belle Station and waited in his parked car across the street." (*Id.* at 6.) Hughes was then "approached by Buehring and Deputies Cogburn and Agrait, removed from his vehicle, [and] placed into handcuffs[.]" (*Id.*)

At some point after the Deputies handcuffed Hughes, Hughes pleaded with the Deputies and Officer Mclaughlin to use the restroom. (*Id.*) They did not permit him to do so. (*Id.*) Hughes states that he was therefore "forced to urinate on himself." (*Id.*) Cogburn then walked over to Officer Mclaughlin and started to talk. (*Id.*) Officer Mclaughlin, however, covered his body camera with his hand for at least thirteen seconds to prevent the conversation from being recorded. (*Id.* at 6–7.) After the concealed conversation, Officer Mclaughlin walked around Hughes's car with a flashlight to "look[] for damages from the alleged assault" that Hughes committed against Buehring. (*Id.* at 7.) Hughes's Sixth Amended Complaint states that Officer Mclaughlin found nothing. (*Id.*)

Hughes, meanwhile, was charged with "Aggravated Assault with a Deadly Weapon" in Harris County District Court. (*Id.*) Allegedly, Buehring told prosecutors that Hughes had hit him with such force that Buehring lacerated his kidney and herniated a disc in his spine. (*Id.* at 7–8.) Notwithstanding his alleged injuries, Buehring apparently worked a shift at Belle Station on the following day and " 'checked-in' on Facebook at the gym" three days later. (*Id.* at 8.) Buehring also stated that he was treated at "Advanced Diagnostics Hospital," but never provided any records to document his injuries. (*Id.*) Hughes was incarcerated for seven days before the case against him was ultimately dismissed. (*Id.*)

## II.    PROCEDURAL POSTURE

This is the fourth round of motions to dismiss. On October 1, 2020, the Court dismissed all claims against Defendant McLaughlin, the responding police officer, on state immunity grounds. (Case No. 4:20-cv-00905, Minute Entry, 10/01/20.) On November 19, 2020, the Court dismissed all claims against Defendant City of Houston on a similar basis. (Case No. 4:20-cv-00905, Minute

Entry, 11/19/20.) And on June 22, 2021, the Court dismissed all state-law tort claims and § 1983 municipal liability claims against Defendant Harris County. (Case No. 4:20-cv-00905, Minute Entry, 06/22/21.) Hughes then filed a Sixth Amended Complaint against Defendants Belle Station, Buehring, Cogburn, Agrait, and Harris County. (Doc. 91.) Defendants Harris County, Agrait, and Cogburn now move to dismiss all claims against them (Doc. 95; Doc. 96.)

## III.     STANDARD OF REVIEW

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering a Rule 12(b)(6) motion, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## IV.     ANALYSIS

### A.  *Harris County's Motion to Dismiss: Municipal Liability for a Custom or Practice*

Harris County first seeks to dismiss Hughes's *Monell* claim for municipal liability, which is lodged under § 1983. Proving a *Monell* claim requires the plaintiff to show: (1) an official policy or custom; (2) a policymaker; and (3) a constitutional violation whose "moving force" is the official policy or custom in question. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Hughes pleads that the County has an official policy of allowing Sheriff's Deputies to work

as security guards for bars in full uniform while off-duty. (Doc. 91 at 15–16) This, Harris County does not dispute. Hughes also pleads that the County maintains a custom of permitting its Deputies to work for establishments that enforce racially discriminatory admissions protocols. (*Id.* at 16.) This, Harris County disputes.

A plaintiff can show a custom by pleading "a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). Still, "[t]o find a municipality liable for a policy based on a pattern, that pattern 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.' " *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 396 (5th Cir. 2017) (internal citations omitted). "A pattern requires similarity, specific, and sufficiently numerous prior incidents." *Id.* The Fifth Circuit maintains a high bar for finding prior incidents sufficiently numerous to constitute a pattern. An eleven-count sample of warrantless searches in Houston, for example, was "just too small" to demonstrate a pattern in *Pineda v. City of Houston*. 291 F.3d 325, 329 (5th Cir. 2002). Similarly, a twenty-seven-incident sample of excessive force across four years in Fort Worth was insufficient considering the size of the police force in *Peterson v. City of Fort Worth, Texas*. 588 F.3d 838, 851–52 (5th Cir. 2009).

This Motion is not the Court's first opportunity to address Hughes's municipal custom claim. Hughes's Fifth Amended Complaint attempted to demonstrate a custom by alleging that Defendant Agrait previously discriminated against minority patrons while working at the door of The Gaslamp, another Houston bar. (Doc. 73 at 18.) On the County's Motion, however, the Court

dismissed that claim without prejudice and stated that Hughes "need[ed] to put together four or five of these incidents—previous incidents to show a pattern." (Case No. 4:20-cv-00905, Unedited Hearing Transcript, 06/22/21, 5.) Hughes's lawyer replied that she could "definitely put together four or five specific incidents." (*Id.*)

Now, Hughes's Sixth Amended Complaint points to four incidents over four years, just three of which occurred prior to the events at issue in this case. The first incident is from September 5, 2015, at The Gaslamp. (Doc. 91 at 19.) There, Defendant Agrait allegedly applied a discriminatory cover charge to a minority patron. (*Id.*) Hughes alleges that Defendant Agrait subsequently arrested the patron and filed charges against him for criminal trespass. (*Id.*) Those charges, however, were ultimately dismissed. (*Id.*) The second incident allegedly occurred on September 11, 2015, at The Gaslamp. (*Id.*) Hughes alleges that a Harris County Deputy Sheriff was posted at the door while the bar applied a minority-specific cover charge to three Black patrons. (*Id.*) That incident begat a lawsuit by the Department of Justice for racially discriminatory practices at The Gaslamp. (*Id.* at 18–20.) The third incident allegedly occurred at Belle Station on June 11, 2017. (*Id.* at 20–21.) There, Defendant Buehring and unnamed Deputies allegedly threatened a patron "for calling out their discriminatory practices" and threatened arrest if the patron did not leave. (*Id.*) Hughes alleges no facts indicating that this incident came to the County's attention. The fourth incident allegedly occurred at Belle Station on October 16, 2019, after the events at issue here. (*Id.* at 20.) In that incident, Hughes alleges that an off-duty Deputy working for the bar discriminated against a minority patron. (*Id.*) That patron was a police officer, and the Deputy detained the officer for failing to provide his credentials and charged him with resisting arrest. (*Id.*) Those charges, too, were ultimately dismissed. (*Id.*)

A "dearth of prior, similar incidents almost invariably results in dismissal" in the Fifth Circuit. *Hamilton v. Turner*, No. 3:13-CV-240, 2014 WL 1513355, at *6 (S.D. Tex. Apr. 16, 2014). Here, even interpreting the facts in the light most favorable to Hughes, three prior incidents do not represent a pattern that "occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *See Davidson*, 848 F.3d at 396. If *Pineda*'s eleven-incident sample and *Peterson*'s twenty-seven-incident sample were both "too small" to show a pattern, then Hughes's three-incident sample is necessarily insufficient as well. And Hughes, for his part, provides no idiosyncratic context to demonstrate that his sample represents an endemic pattern. Rather, Hughes alleges that Harris County bans Deputies from working at establishments with repeated issues of discrimination, suggesting that the County actually disallows the custom in question. (Doc. 91 at 16–17.) Hughes's Sixth Amended Complaint therefore does not plausibly "warrant[] the attribution to [Harris County] of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *See Davidson*, 848 F.3d at 396. Consequently, the Court grants the County's Motion to Dismiss Hughes's § 1983 custom or practice claim.

A district court "should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2). "But leave may be denied when it would cause undue delay, be the result of bad faith, represent the repeated failure to cure previous amendments, create undue prejudice, or be futile." *Morgan v. Chapman*, 969 F.3d 238, 248 (5th Cir. 2020). Here, Hughes failed to plausibly plead a pattern despite a specific instruction from the Court to that end. Leave to amend would thus "represent the repeated failure to cure previous amendments." *See id.* Because Hughes already

received an opportunity to cure this very defect, the Court dismisses Hughes's *Monell* claim under § 1983 against Harris County with prejudice.[1]

### B. *Harris County's Motion to Dismiss: Municipal Liability for Failure to Train*

Harris County also seeks to dismiss Hughes's failure-to-train claim. For failure-to-train liability under § 1983, Hughes must show: (1) Harris County "was deliberately indifferent in adopting its training policy;" (2) Harris County's "training policy procedures were inadequate;" and (3) Harris County's "inadequate training policy directly caused" the alleged constitutional violations. *Sanders-Burns v. City Of Plano*, 594 F.3d 366, 381 (5th Cir. 2010). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). As with the general custom or practice standard, this too is a high bar: "deliberate indifference generally requires that a plaintiff demonstrate 'at least a pattern of similar violations' arising from training that is so clearly inadequate as to be 'obviously likely to result in a constitutional violation.' " *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003).

An unpublished decision, *Saenz v. City of El Paso*, demonstrates the threshold that failure-to-train claims must clear in the Fifth Circuit. 637 F. App'x 828 (5th Cir. 2016). In *Saenz*, the plaintiff alleged twenty-one previous incidents over nineteen years in which a police officer shot and killed someone. *Id.* at 832. Still, the Fifth Circuit reasoned that "[w]ithout further context surrounding the circumstances, the allegations of prior shootings do not plausibly suggest a pattern

---

[1] Because the Court dismisses Hughes's *Monell* claim for failure to plead a policy or practice, the Court does not address Harris County's conclusory argument that, "[a]s a threshold matter, Mr. Hughes never alleges a policymaker, nor does he show a moving force." (Doc. 96 at 5.)

of abuses to which the City was deliberately indifferent." *Id.* As such, the plaintiff's complaint "stop[ped] short of the line between possibility and plausibility." *Id.*

Here, Hughes pleads just three prior incidents over a four-year span. As in *Saenz*, then, Hughes's Sixth Amended Complaint falls short of the plausibility threshold. Pleading three prior incidents does not plausibly indicate a pattern of violations such that the County's training was "obviously likely to result in a constitutional violation." *See Burge*, 336 F.3d at 370. What's more, Hughes does not allege that the County had notice of one of the prior incidents. In *Connick v. Thompson*, the Supreme Court recognized that "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." 563 U.S. 51, 62 (2011). Given that the County can be charged with notice of only two of the three prior incidents, Hughes's failure-to-train claim rests on even weaker footing than his custom claim. Furthermore, Hughes fails to allege how the County's training was constitutionally deficient. Instead, he merely states that the County has "failed to implement and/or enforce training and policies to protect its citizens from constitutional violations and abusive practices," and alleges that the County "has not taken a proactive approach to protect its citizens from future constitutional deprivations by properly training, supervising, and disciplining officers working [as] 'extras' at nightclubs." (Doc. 91 at 8, 16.) Such conclusory assertions, without more, do not clear the plausibility hurdle. As such, the Court grants the County's Motion to Dismiss for Hughes's failure-to-train claim.

Just as with Hughes's custom claim, this is not the Court's first opportunity to address his failure-to-train claim. The Court previously dismissed this claim when Hughes tried to disguise it as a gross negligence claim. (Case No. 4:20-cv-00905, Minute Entry, 06/22/21.) Dismissal here therefore results from Hughes's "repeated failure to cure previous amendments." *See Morgan*, 969

F.3d at 248. Hughes's inability to allege any facts that illuminate the contours of the County's training program also suggests that leave to amend would prove "futile." *See id.* Consequently, the Court dismisses Hughes's failure-to-train claim against Harris County with prejudice.

### C. *The Deputies' Motion to Dismiss: Qualified Immunity*

Hughes also alleges § 1983 claims against Defendants Agrait and Cogburn. In response, the Deputies claim qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A government official is entitled to qualified immunity unless the plaintiff (1) alleges facts sufficient to "make out a violation of a constitutional right," and (2) shows that the constitutional right "was 'clearly established' at the time of" the official's alleged misconduct." *Id.* at 232. Put simply, "[q]ualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.*

### 1.  Hughes makes out a violation of a constitutional right

Hughes's strongest allegation against the Deputies under § 1983 is that the Deputies violated his "right against unreasonable . . . seizure guaranteed by the Fourth Amendment[.]" (Doc. 91 at 21.) "A warrantless arrest violates a suspect's Fourth and Fourteenth Amendment rights if the arresting officer lacks probable cause to believe that the suspect has committed a crime." *Bodzin v. City of Dallas*, 768 F.2d 722, 724 (5th Cir. 1985). To make out a § 1983 claim for false imprisonment in violation of the right against unreasonable seizure, the plaintiff must "plausibly allege that [the defendant] 'did not have probable cause to arrest him.' " *Arnold v. Williams*, 979

F.3d 262, 269 (5th Cir. 2020) (quoting *Haggerty v. Texas Southern University*, 391 F.3d 653, 655

(5th Cir. 2004). Probable cause exists only "if the officer was aware of facts justifying a reasonable

belief that an offense was being committed, whether or not the officer charged the arrestee with

that specific offense." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009).

The Deputies assert that they did not violate Hughes's constitutional right against

unreasonable seizure because they had probable cause to arrest him for assault. To support this

argument, the Deputies note that Buehring told them "that Mr. Hughes injured him with his car."

(Doc. 95 at 22.) But Buehring's statement is the only evidence that supports the alleged assault.

To wit, Hughes alleges that the Deputies were present when the assault was supposed to have

occurred, and yet "both deputies admit on body camera footage to not seeing [Hughes] hit

Defendant Buehring with his vehicle[.]" (*Id.* at 13.) What's more, Hughes alleges that there was

no damage to his car, which should have been plain to the Deputies when they pulled him from

the vehicle. (*Id.* at 7.) Viewing these well-pleaded facts in the light most favorable to Hughes, his

Sixth Amended Complaint plausibly suggests that the Deputies lacked probable cause to believe

that he hit Defendant Buehring with his car. The Deputies' own admission that they did not see

Hughes strike Buehring with his car, in conjunction with the complete lack of physical evidence

supporting Buehring's assertion, indicate that the Deputies plausibly lacked "a reasonable belief

that an offense" had been committed. *See Club Retro*, 568 F.3d at 204. Hughes's Sixth Amended

Complaint therefore plausibly alleges that the Deputies did not have the requisite probable cause

to arrest him for assault.

In the alternative, the Deputies argue that they had probable cause to arrest Hughes for

criminal trespassing. Even though Hughes was never charged with that offense, a "warrantless

arrest [is] valid so long as the officers had probable cause to arrest [the individual] for any crime

based on the facts within their knowledge." *Arizmendi v. Gabbert*, 919 F.3d 891, 901 (5th Cir. 2019) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). The Deputies analogize this case to *Bodzin*, where the Fifth Circuit held that officers had probable cause for criminal trespass after a store manager told them that the plaintiff was on the store's property, had been asked to leave, and had not done so. 768. F.2d at 724. The officers in *Bodzin* also saw the plaintiff in an area that the manager said was private property and overheard the plaintiff refusing to leave after being told to do so. *Id.* Extrapolating from *Bodzin*, the Deputies assert that, based on Defendant Buehring's allegations and their own observations, they too had probable cause to arrest Hughes for criminal trespassing because they "knew that Mr. Hughes had returned to the bar and the bar parking lot after being asked by [Defendant Buehring] to leave." (Doc. 95 at 22.) Hughes's Sixth Amended Complaint, however, plausibly begs to differ.

Hughes's Sixth Amended Complaint contains three conceivable instances of criminal trespassing. The first occurred when Hughes returned to Belle Station's front door to retrieve his debit card. (Doc. 91 at 3.) When Hughes got back to the entrance, Defendant Buehring told him "to leave immediately," but Hughes lingered. (*Id.* at 3–4.) Arguably, then, Hughes "had notice that the entry [to Belle Station] was forbidden; or . . . received notice to depart but failed to do so." TEX. PENAL CODE ANN. § 30.05.[2] Still, nothing in the pleadings indicates that Hughes was on Belle Station property at the time. Rather, Hughes's Sixth Amended Complaint alleges that he stayed outside the entrance and simply asked bar employees to recover his card. (Doc. 91 at 3–4.)

---

[2] Texas Penal Code § 30.05 reads in relevant part: "(a) A person commits an offense if the person enters or remains on or in property of another . . . without effective consent and the person: (1) had notice that the entry was forbidden; or (2) received notice to depart but failed to do so. (b) For purposes of this section: (1) "Entry" means the intrusion of the entire body. (2) "Notice" means: (A) oral or written communication by the owner or someone with apparent authority to act for the owner[.]"

Interpreting these facts in the light most favorable to Hughes, it is plausible that the Deputies had no reason to believe that Hughes had re-entered Belle Station. As a result, it is also plausible that the Deputies lacked probable cause to arrest him for criminal trespassing from this interaction.

The second instance occurred when Hughes went to his car after failing to retrieve his debit card. Hughes's Sixth Amended Complaint alleges that, when he got to his car, he called 9-1-1. (*Id.* at 4.) He then waited "for police to arrive." (*Id.*) Hughes's decision to wait in his car could conceivably constitute criminal trespassing if he remained on Belle Station property. After all, he had already "received notice to depart." *See* TEX. PENAL CODE ANN. § 30.05. Again, however, nothing in the pleadings suggests that Hughes waited on Belle Station property. Given that the Court must view the complaint's well-pleaded facts in the light most favorable to Hughes, it is plausible that the Deputies lacked the requisite probable cause to believe that Hughes committed a criminal trespass when he waited in his car.

Third, after Hughes drove away, the 9-1-1 dispatcher told him "to wait outside of the bar in his vehicle for police to arrive." (*Id.* at 6.) Hughes then allegedly did "as instructed . . . and pull[ed] back around to Belle Station and wait[ed] in his parked car across the street." (*Id.*) The Deputies argue that this series of events gave them probable cause to arrest Hughes for criminal trespassing because they knew that he had "returned to . . . the bar parking lot after being asked . . . to leave." (Doc. 95 at 22.) Once again, however, the problem for the Deputies is that the pleadings do not indicate that Hughes returned to Belle Station property. Rather, Hughes alleges that he waited "in his parked car across the street." (Doc. 91 at 6.) And while it is true that "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity," there is nothing to suggest that the Deputies reasonably concluded that probable cause was present. *See Haggerty*, 391 F.3d at 658. This case is quite unlike *Bodzin*: here,

13

the pleadings do not indicate that anyone ever told the Deputies that Hughes was on Belle Station's property when he parked across the street. Consequently, taking as true Hughes's well-pleaded assertion that he waited in his parked car across the street from Belle Station, it is plausible that a reasonable officer would not have believed that Hughes was trespassing when he drove back to the bar.

Overall, then, it is plausible that the Deputies detained Hughes without probable cause to believe that he had assaulted Buehring or committed a criminal trespass. As a result, Hughes plausibly makes out a violation of his constitutional right to be free from unreasonable seizure.[3]

### 2.   Hughes can show that the right was clearly established

"The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). " '[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.' " *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). As revealed by the Deputies' own citation to *Bodzin*, there is no dispute that it was clearly established law on January 14, 2018, that "[a] warrantless arrest violates a suspect's Fourth and Fourteenth Amendment rights if the arresting officer lacks probable cause to believe that the suspect has committed a crime." 768 F.2d at 724.

---

[3] The Deputies also cite *Castellano v. Fragozo* for the proposition that pleading a simple lack of probable cause does not suffice to make out a constitutional violation because "causing charges to be filed without probable cause will not without more violate the Constitution." 352 F.3d 939 (5th Cir. 2003). But the Deputies misread *Castellano*. *Castellano* addressed a claim of malicious prosecution, not unreasonable seizure. *Castellano* thus stands for the narrow proposition that a claim for malicious prosecution requires more than a lack of probable cause under § 1983. The language that the Deputies cite has no bearing on whether a lack of probable cause is sufficient to make out a violation of the constitutional right against unreasonable seizure.

Thus, Hughes alleges sufficient facts to plausibly make out a violation of his constitutional right against unreasonable seizure and to show that the right was clearly established at the time of the Deputies' alleged misconduct. As a result, the Court denies the Deputies' Motion for qualified immunity from Hughes's unreasonable seizure claim.

### 3.  Hughes's unreasonable search and standalone Due Process claims

Hughes's Sixth Amended Complaint also generally alleges that the Deputies "violated Plaintiff's right against unreasonable search and seizure guaranteed by the Fourth Amendment, and right to Due Process guaranteed by the Fourteenth Amendment." (Doc. 91 at 21.)  Historically, the Fifth Circuit has broken down similar allegations into individual claims for unreasonable search, unreasonable seizure, and Due Process violations. *See e.g.*, *Arnold v. Williams*, 979 F.3d 262, 270 (5th Cir. 2020) (conducting a separate analysis for plaintiff's unreasonable search, unreasonable seizure, and generalized Due Process claims).

Hughes's Sixth Amended Complaint, however, contains no allegations that directly relate to an unreasonable search. And as for Hughes's Due Process claim, resort to a generalized remedy under the Due Process Clause is inappropriate where a more specific constitutional provision provides the rights at issue. In *Arnold*, for example, the Fifth Circuit reasoned that, where the plaintiff's rights were "protected by the unreasonable-searches-and-seizures clause of the Fourth Amendment," he failed to state a general "claim under the Fourteenth Amendment's Due Process Clause." *Id.* So too here. Hughes plausibly pleads that the Deputies violated his constitutional right to be free from unreasonable seizure, but he alleges nothing more to support a general Due Process claim. Consequently, the Court grants the Deputies' Motion to Dismiss Hughes's unreasonable

search and generalized Due Process claims. Because this is the first substantive back-and-forth on these claims, however, the Court dismisses them without prejudice.

### D. The Texas Tort Claims Act

The Deputies also move to dismiss Hughes's state-law tort claims under the election-of-remedy provisions of the Texas Tort Claims Act (TTCA). (Doc. 95 at 5–6.) In support, the Deputies cite §§ 101.106(a), (e), and (f). (*Id.*) Harris County joins them in this Motion and incorporates the Deputies' arguments by reference. (Doc. 96 at 1.)

In 2003, the Legislature passed the election-of-remedy provisions "to force a plaintiff to decide at the outset whether an employee acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008). By forcing this choice at the outset, the TTCA was designed to reduce "the resources that the government and its employees must use in defending redundant litigation and alternative theories of recovery." *Id.* The election-of-remedy provisions fit together like a jigsaw puzzle; they must be read "as a whole, giving effect to all[.]" *Hernandez v. City of Lubbock*, 253 S.W.3d 750, 756 (Tex. App. 2007). The first piece of that puzzle, § 101.106(a), forecloses certain avenues of relief if the plaintiff initially proceeds against the governmental unit alone: "The filing of a suit under this chapter against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter." TEX. CIV. PRAC. & REM. CODE ANN. § 101.106. The second piece, § 101.106(b), provides for the opposite outcome if the plaintiff initially proceeds against the employee alone: in that case, the plaintiff irrevocably elects to sue only the employee. *Id.* §§

16

101.106(e) and 101.106(f), meanwhile, apply when the plaintiff initially sues both the employee and the governmental unit. Under § 101.106(e): "[i]f a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." *Id.* And under § 101.106(f): "If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only." *Id.* "Because the decision regarding whom to sue has irrevocable consequences, a plaintiff must proceed cautiously before filing suit and carefully consider whether to seek relief from the governmental unit or from the employee individually." *Garcia*, 253 S.W.3d at 657.

Given that Hughes sues both the Deputies and Harris County, the Court begins (and ends) its analysis with § 101.106(e). § 101.106(e) comes into play when "a suit is filed under this chapter against both a governmental unit and any of its employees." TEX. CIV. PRAC. & REM. CODE ANN. § 101.106. Texas courts have interpreted the phrase "under this chapter" broadly: the provision applies "if a plaintiff brings virtually any state common law tort claim against both a governmental unit and its employees." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 463 (5th Cir. 2010). But Hughes's Sixth Amended Complaint, however, does not assert any state common law tort claims against Harris County. Rather, Hughes pleads only federal § 1983 claims against the County. In theory, then, Hughes might not have a "state common law tort claim against both a governmental unit and its employees." *See id.* Hughes did, however, originally assert state-law tort claims against the Deputies, the Sheriff's Department, and Harris County. (*See e.g.*, Doc. 12 at 10–11.) Consequently, whether § 101.106(e) applies to Hughes's claims depends on whether it encompasses only the current pleading or reaches back to cover earlier filings as well. If §

101.106(e) accounts only for Hughes's Sixth Amended Complaint, then the County cannot exploit the provision to dismiss the Deputies. If, however, Hughes's earlier complaints implicate the provision, then the Court must grant the County's Motion to Dismiss the Deputies.

"To determine state law, federal courts sitting in diversity look to the final decisions of the state's highest court." *American Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003). If there is no "final decision by the state's highest court on the issue at hand, it is the duty of the federal court to determine, in its best judgment, how the highest court of the state would resolve the issue if presented with the same case." *Id.* Neither the statutory scheme nor precedent provides a clear answer to the quandary at issue here. Two cases, however, do shed some light on this question.

First, in *Texas Department of Aging & Disability Services v. Cannon*, the plaintiff initially sued a governmental unit and its employees for state-law tort claims. 453 S.W.3d 411, 413 (Tex. 2015). After the defendants moved to dismiss under §§ 101.106(a) and (e), the plaintiff amended her petition to add § 1983 claims and dismiss all state-law tort claims. *Id.* From that moment forward, the plaintiff's complaint contained only federal claims. *Id.* As a result, the trial court denied the motions to dismiss that were originally brought under the TTCA. *Id.* The Supreme Court of Texas affirmed the trial court's decision because the complaint alleged no state-law tort claims. *Id.* at 419. In reaching that holding, however, the Court also stated that the plaintiff "does not dispute that, by asserting common-law tort claims against both the Department and the Employees, she made an irrevocable election under subsection (e) to pursue those claims against the government only, even though the court of appeals ultimately determined that the government was immune from suit." *Id.* at 417. This dictum implies that § 101.106(e) encompasses prior pleadings. If § 101.106(e) applied only to the pleadings that were then live before the Court, the

plaintiff would not have made an "irrevocable election" under the TTCA with her initial filing. Nevertheless, the Texas Supreme Court apparently believed that the plaintiff's original decision to bring state-law tort claims against a governmental unit and its employees triggered the application of § 101.106(e). *Cannon* therefore supports the theory that the plaintiff's initial decision to proceed against both a governmental unit and its employees imbues the government with the permanent power to dismiss its employees under § 101.106(e).

    *University of Texas Health Science Center at Houston v. Rios* militates in the same direction. 542 S.W.3d 530 (Tex. 2017). In that case, the plaintiff also brought state-law tort claims against a governmental unit and its employees. *Id.* at 533. The governmental unit then moved to dismiss the claims against the employees under § 101.106(e). *Id.* In response, the plaintiff amended his petition to drop his tort claims against the governmental unit but kept the unit in the suit on a breach-of-contract claim. *Id.* The defendants, however, did not drop their § 101.106(e) argument. *Id.* On appeal, the Texas Supreme Court recognized that § 101.106(e) entitled the employees to dismissal when the governmental unit originally filed its motion to dismiss. *Id.* at 537. Consequently, the Court reasoned that, "following [the plaintiff's] amended petition, defendants remained entitled to dismissal of the tort claims asserted against the [employees] in his original petition, as requested in defendants' original motion to dismiss." *Id.* Notably, the Court also stated that the plaintiff "made an irrevocable election to pursue a vicarious-liability theory against the [governmental unit] by alleging in his original petition state-law tort claims against both the [government] and the [employees] that were premised on the [employees] being [governmental] employees." *Id.* at 538. As in *Cannon*, this dictum was not critical to the holding of the case. Still, *Rios*'s declaration that the plaintiff made an irrevocable election based on his initial petition again weighs in favor of reading § 101.106(e) to encompass a plaintiff's original filings.

The case at bar, meanwhile, does not fall cleanly within the ambit of either *Cannon* or *Rios*. In both of those cases, the government moved to dismiss its employees under § 101.106(e) when there were still state-law tort claims pending against both parties. Here, by contrast, Harris County cited § 101.106(e) only after Hughes's state-law allegations against the County had been dismissed. In theory, then, Hughes's Sixth Amended Complaint might not be "filed under this chapter" against both the Deputies and Harris County within the meaning of § 101.106(e). Moreover, given that the Legislature expressly included an "irrevocable election" provision in §§ 101.106(a) and (b), the lack of such language in subsection (e) could indicate that subsection (e) was not designed to reach back to a plaintiff's original filings.

Nevertheless, the cut and thrust of the caselaw suggests that § 101.106(e) is triggered by the plaintiff's initial filings. The Texas Supreme Court's assertions in *Cannon* and *Rios* indicate that it views § 101.106(e) as incorporating an irrevocable election framework not unlike that in §§ 101.106(a) and (b). Even though the Court did couch its language in *Cannon* by framing its assertion as something that the plaintiff "[did] not dispute," the Court unambiguously indicated that the plaintiff "made an irrevocable election under subsection (e) to pursue those claims against the government only." 453 S.W.3d at 417. That interpretation is also not out of step with the text of the TTCA, as § 101.106(e) contains no time limit as to when the governmental unit can seek dismissal. It is therefore consistent with the text of subsection (e) for the government to retain the power to dismiss its employees once a suit is initially filed against both a governmental unit and its employees. *See Crockett County. v. Damian*, 622 S.W.3d 58, 61 (Tex. App. 2020) ("[S]ince 2003, in order to proceed against a public employee in his individual capacity under a state-law-tort theory, a plaintiff must choose to do so when suit is originally filed . . . or risk forever barring that claim if the governmental unit opts to dismiss its employee under § 101.106(e)."). Plus, a

20

broad interpretation of § 101.106(e) accords with the purpose behind the election-of-remedy provisions, which was "to force a plaintiff to decide at the outset whether an employee acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable[.]" *Garcia*, 253 S.W.3d at 657. Any other interpretation here would permit Hughes to vacillate as to whether he wishes to sue the Deputies in their individual or official capacities, contravening the goal of the election-of-remedy provisions. As a result, the Court interprets Hughes's earlier pleadings with state-law tort claims against the County and the Deputies as having triggered the County's right to dismiss its employees under § 101.106(e). The Court therefore grants Harris County's Motion to Dismiss Hughes's state-law tort claims against the Deputies. And because TTCA immunity renders further amendment futile, this dismissal must be with prejudice. *See Morgan*, 969 F.3d at 248.

Because the Court dismisses the state-law tort claims against the Deputies on the County's Motion pursuant to § 101.106(e), the Court does not reach the Deputies' arguments under §§ 101.106(a) or 101.106(f).

## V.   CONCLUSION

For the reasons described above and as stated on the record at the September 10, 2021 hearing, the Court **GRANTS** Harris County's Motion to Dismiss Hughes's §1983 claims against the County and **DISMISSES** those claims **WITH PREJUDICE**. The Court also **GRANTS** the County's Motion to Dismiss the state-law tort claims against Defendants Agrait and Cogburn under TTCA § 101.106(e) and **DISMISSES** those claims **WITH PREJUDICE**. As for the Deputies' Motion, the Court **GRANTS** the Deputies' Motion to Dismiss Hughes's § 1983 claims for unreasonable search and standalone Due Process violations and **DISMISSES** those claims

**WITHOUT PREJUDICE**. Finally, the Court **DENIES** the Deputies qualified immunity on Hughes's unreasonable seizure claim and so **DENIES** the Deputies' Motion to Dismiss that claim.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this 4th day of October, 2021.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE